LONG ISLAND CONTRACTING AND SUPPLY COMPANY, Appellant, *v.* THE CITY OF NEW YORK, Respondent.

Contract — damages — action for breach of an executory contract — what damages may be recovered for defendant's breach of contract.

1. The measure of damages for the breach of an executory contract is the amount of the loss sustained including the profits prevented. While this does not include the profits of collateral enterprises in which the party has been induced to engage by relying on the performance of the contract, profits and advantages which are the direct and immediate fruits of the contract entered into between the parties are part and parcel of the contract itself, entering into and constituting a portion of its elements, and they are presumed to have been taken into consideration and deliberated upon before the contract was made.

2. In an action for breach of a contract, under which plaintiff was to grade and improve certain streets, plaintiff sought to recover as damages, among other things, the market value of certain "top soil" which was to be removed. The contract provided that "all surplus materials, earth, sand, rubbish and stones * * * are to be removed from the line of the work." *Held,* that the surplus earth was part of the compensation for doing the work of excavation and that the top soil belonged to the contractor so fast as it was excavated and loaded for removal; hence, plaintiff is entitled to recover as damages, among other things, the market value of such soil, after deducting the reasonable expense of marketing the same.

*Long Island C. & S. Co.* v. *City of New York,* 136 App. Div. 915, reversed.

(Argued December 6, 1911; decided January 9, 1912.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered January 26, 1910, affirming a judgment in favor of plaintiff entered upon a verdict.

This action was brought to recover the sum of $20,000 as damages for the breach by the defendant of its contract with the plaintiff, whereby the latter agreed, for a consideration to be paid by the former, to regulate, grade, curb and lay sidewalks and crosswalks on Ditmars avenue, between Steinway avenue and the Shore road. This section of Ditmars avenue was a new street in process of construction over undulating land, somewhat wooded, and a part of which had never been cultivated. The contract, dated June 26, 1906, provided that the work should be performed within one hundred working days after the contractor should have begun work on notice from the president of the borough. The only prices mentioned are a certain sum per linear foot for curbing and per square foot for flagging and bridging, and for "all excavation the sum of twenty cents per cubic yard." As the cut exceeded the fill, there was bound to be surplus earth even after the low places had been filled, and the work of excavation, for which twenty cents per cubic yard was to be paid, included both making the fill and the removal of the surplus earth. After the plaintiff had been notified to commence work and had incurred expenses in preparing to perform the contract, the city changed the plan of construction so that performance by the plaintiff became impossible and it was so notified by the proper authority.

In its complaint the plaintiff asked to recover the amount expended in preparation and the difference between the contract price and the cost of performance, including as part of the former the market value of 20,666 cubic yards of top soil which by the terms of the contract, as it alleged, would have belonged to it if performance had been permitted. The defenses set forth

in the answer, aside from a partial denial, are not now material.

Upon the trial evidence was given tending to show that if the contract had been performed there would have been a large quantity of top soil which was not needed for filling purposes and could not be used therefor and which consequently would have to be removed. The court refused to allow any recovery on account of the top soil or to permit evidence to be given as to the market value thereof. The jury found a verdict for the sum of $750 in favor of the plaintiff, and its motion to set the same aside as inadequate and for other reasons was denied. Upon appeal to the Appellate Division the judgment entered on the verdict was affirmed, one of the justices dissenting, and thereupon the plaintiff appealed to this court.

*Edward M. Grout, Paul Grout* and *James F. McKinney* for appellant. The trial justice erred in excluding from the consideration of the jury the item claimed for market value of top soil. (*Masterton & Smith* v. *City of Brooklyn,* 7 Hill, 61; *United States* v. *Speed,* 8 Wall. 85; *United States* v. *Smith,* 4 Otto, 215; *United States* v. *Behan,* 110 U. S. 339; *S. I. W. Co.* v. *Mayor, etc.,* 66 Fed. Rep. 140; *Story* v. *N. Y. & H. R. R. Co.,* 6 N. Y. 86; *Devlin* v. *Mayor, etc.,* 63 N. Y. 8; *Donalds* v. *State,* 89 N. Y. 36; *Dillon* v. *Anderson,* 43 N. Y. 234; *Pennell* v. *Mayor, etc.,* 17 App. Div. 455; *Lynch* v. *Mayor, etc.,* 2 App. Div. 213.)

*Archibald R. Watson, Corporation Counsel* (*Theodore Connoly* and *Clarence L. Barber* of counsel), for respondent. Evidence of profits from removal of top soil might properly have been excluded, because such profits were not contemplated by the parties, and because they were speculative and uncertain. (1 Sedgwick on Damages [8th ed.], §§ 158, 159; *Griffin* v. *Colver,* 16 N. Y. 489; *Passenger* v. *Thorburn,* 34 N. Y. 634; *Booth* v. *S. D. R. M. Co.,* 60 N. Y. 487; *Witherbee* v. *Meyer,* 155 N. Y.

446; *L. P. Co.* v. *State*, 45 App. Div. 112; *Reilly* v. *Connors,* 65 App. Div. 470; *Meyer* v. *Haven,* 70 App. Div. 529; *Rau* v. *Weyand,* 89 App. Div. 200; *Hirsh* v. *P. P. Co.,* 141 App. Div. 357; *Masterton* v. *City of Brooklyn,* 7 Hill, 61.) Possible profits from the removal and sale of top soil cannot be recovered, because such profits would involve one or more sub-contracts. (*Masterton* v. *Mayor, etc.,* 7 Hill, 61; *Devlin* v. *Mayor, etc.,* 63 N. Y. 8; *Hirsh* v. *P. P. Co.,* 141 App. Div. 357; 1 Sedgwick on Damages [8th ed.], § 156; *Storey* v. *N. Y. & H. R. R. Co.,* 6 N. Y. 85; *Brodie* v. *Fost,* 123 App. Div. 749.)

Vann, J. Among the specifications attached to the contract and made a part thereof were the following:

"4. All old material which will not be used in the work, excepting bridge stone and specification paving stone, shall become the property of the contractor and be removed by him * * *."

"8. All materials of every description, earth, rock, subsoil, vegetable or other matter, brick and stone masonry, overlying the sub-grade hereinafter described shall be removed. * * *. The cost of grubbing up and removing any trees, shrubbery, fences, timber, pipes, rubbish or filth shall be included in the price bid for excavation.

"9. Should any soft, spongy, vegetable or other objectionable matter be disclosed by the excavation thus made or be located where filling is to be done, such material shall be removed and replaced with coarse sand, gravel or other suitable material, which shall be thoroughly compacted as hereinafter directed at the price herein bid for earth excavation.

"11. Such excavated material as may be fit for the purpose and as may be necessary shall be used to fill in those parts of the street which are below the aforesaid grades or which have become so by the removal of rock or improper material in the manner hereafter provided, and the price paid per cubic yard of excavation is to

include the cost of properly placing such excavated material as filling an embankment and the removal from the work of such as is not so utilized.

"12. No excavated or other material necessary to be disposed of shall be dumped or placed within the limits of any existing or projecting public street or road, nor shall any material be excavated and removed from such location without the written permission of the engineer.

"15. All filling shall be good, wholesome earth, free from all frozen materials, garbage, vegetable, spongy or unsuitable matter.

"52. All surplus materials, earth, sand, rubbish and stones, except such stones as are retained by order of the engineer, are to be removed from the line of the work, block by block, as rapidly as the work progresses. All material covering the pavement and sidewalks shall be swept into heaps and immediately removed from the line of the work."

The main question presented for decision is, to whom, according to these provisions, would the "surplus earth," including top soil, belong after it was excavated and ready for removal? Assuming, without deciding, that the old material mentioned in clause four does not include the excavation of virgin soil, there was no express provision that the surplus earth should belong to the contractor, but, even on this assumption, the requirement that the contractor should remove the surplus earth, with no reservation of title by the city, no stipulation that it should be removed to a specified place and no direction as to what should be done with it, except simply to remove it from the line of the work, implies that the contractor could do what he wished with it. He was bound to get rid of it and this was an abandonment or transfer by the city of its right thereto. It was part of his compensation for doing the work of excavation. The city had acquired the land on which the street was to be constructed and it is not claimed that the surplus earth

belonged to the former owner of the fee. The duty to excavate and remove it, without any reservation or condition, made it the property of the contractor as soon at least as it was loaded upon carts or other vehicles for the purpose of removal. In this respect the contract is not unlike one to tear down a house and remove the materials. If nothing is said as to what is to be done with them after they are removed, by necessary implication they belong to the contractor.

It is insisted that according to the stipulation in the twelfth clause the surplus earth could not have been removed without the written permission of the engineer and that such permission might have been withheld. The duty to remove is as imperative as the duty to excavate and it would be strange if, after the work was in progress, it was necessary for the contractor to obtain permission at every step as the work proceeded to do what the contract expressly required to be done. If, however, as to part of the work there was a special reason for requiring permission in order to regulate methods and prescribe conditions, such a stipulation would be natural.

The words "such location" as they are used in the twelfth clause, do not mean the line of the work, but "existing or projecting" streets. The line of the work is not mentioned in said clause either directly or indirectly, and the word "such" carries the word "location" back to the last preceding word of the same class or meaning and hence to "streets" existing or projecting. The new street crossed existing streets and the ends of other streets which projected therein to some extent. In constructing crosswalks over the new street the pavement and grading of the existing streets would have to be taken up and interfered with more or less. So the projecting streets would have to be disturbed somewhat in order to construct the sidewalks on the margin of the new street. Some excavation would be required and there would be some material to be removed. The object of

the latter part of the clause was to prevent the excavation of completed work at a street crossing without the permission of the engineer. It was a judicious precaution to keep the contractor from excavating in a constructed street and removing the sound material without permission from the skilled man in charge of the work, who might properly attach to the permit conditions of great importance to the city and possibly without increasing the expense of the contractor. This, as we think, was the purpose of the stipulation under consideration, and the same result would follow even if "projecting" is a misprint for "projected," as the city would naturally intrust the method of intersection to the direction of the engineer rather than to the discretion of the contractor. The object of the entire clause was to prevent the deposit of excavated material upon transverse streets, whether wholly completed across the new street or merely projecting therein, and also to prevent the excavation or removal of material from that particular location without the consent of the engineer. Accordingly we hold that according to the contract the top soil belonged to the contractor as fast as it was excavated and loaded for removal.

The plaintiff introduced evidence tending to show that there would have been 8,950 cubic yards of soil which it would have been required to remove over and above that needed for fill and that part of it was top soil. It offered to show by appropriate questions that there was a market value for top soil and what such value was in excess of the cost of excavating and removing it. The court at first excluded all evidence upon the subject on the ground that it involved a collateral contract and the plaintiff excepted. Later in the trial the ruling was relaxed to the extent of receiving evidence that dealers would gladly remove the top soil for nothing if it was given to them. This was admitted simply to show that the cost of performing the contract would have been less than

it would have been had the contractor removed it at his own expense. The defendant contends that the ruling was further relaxed so as to admit evidence of market value, but the record does not support that position. The record is somewhat diffuse and confusing, but when carefully read shows that the court adhered to its ruling as originally made except to the extent already stated. Any doubt upon the subject is resolved by the charge, in which the court said: "There are some things which are out of the case that are included in the plaintiff's claim. The plaintiff claims that on the line of this proposed work there was a considerable quantity of loam, or top soil as it is called; that there was a market for it and that they could have earned a very substantial sum of money for it, and the court allowed some of the testimony with respect to the top soil to go in and some of the testimony it excluded upon this theory, that what the plaintiff could have made if it had been permitted to gather and sell the top soil at a profit was not within the reasonable contemplation of the parties to the contract, and that it cannot claim that as an element of damage, as it was uncertain."

These rulings require a reversal of the judgment. No collateral contract was involved, for the sale of a substance with a market value is not a sub-contract as that term is known in the law any more than the sale of wheat or cotton. As was said by Mr. Justice WOODWARD in his dissenting opinion below: "The plaintiff did not seek to prove a sub-contract for removing the surplus top soil, but merely the amount that would have accrued from a sale of it in the open market, as an element of damage resulting from the defendant's breach of the contract."

As the top soil was part of the plaintiff's compensation, it was entitled to recover the market value thereof after deducting all necessary expenses. As a general rule the measure of damages for the breach of an executory contract is the amount of the loss sustained

including the profits prevented. This, however, does not include the profits of collateral enterprises in which the party has been induced to engage by relying on the performance of the contract. The law on the subject was settled by an early case in this state, which has been uniformly followed by our courts, and generally elsewhere throughout the country. (*Masterton* v. *Mayor, etc., of Brooklyn*, 7 Hill, 61.) The language of Chief Justice Nelson, in writing the leading opinion in that case, is appropriate to the case in hand: "When the books and cases speak of the profits anticipated from a good bargain as matters too remote and uncertain to be taken into the account in ascertaining the true measure of damages, they usually have reference to dependent and collateral engagements entered into on the faith and in expectation of the performance of the principal contract. * * * But profits or advantages which are the direct and immediate fruits of the contract entered into between the parties, stand upon a different footing. These are part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed perhaps the only inducement to the arrangement. * * * Such being the relative position of the contracting parties, it is difficult to comprehend why, in case one party has deprived the other of the gains or profits of the contract by refusing to perform it, this loss should not constitute a proper item in estimating the damages. To separate it from the general loss would seem to be doing violence to the intention and understanding of the parties, and severing the contract itself." (p. 68.)

In *United States* v. *Behan* (110 U. S. 338, 344) the court said: "The *prima facie* measure of damages for the

breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely: *first,* what he has already expended towards performance (less the value of materials on hand); *secondly,* the profits that he would realize by performing the whole contract. The second. item, profits, cannot always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires. But when, in the language of Chief Justice NELSON, in the case of *Masterton* v. *Mayor of Brooklyn* (7 Hill, 69), they are ' the direct and immediate fruits of the contract,' they are free from this objection; they are then ' part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation.' * * * As before stated, the primary measure of damages is the amount of the party's loss; and this loss, as we have seen, may consist of two heads or classes of damage — actual outlay and anticipated profits. * * * But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is, the amount when he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services. If he chooses to go further, and claims for the loss of anticipated profits, he may do so, subject to the rules of law as to the character of profits which may be thus claimed."

We think that, according to the record now before us, the plaintiff should have recovered as damages for the absolute breach of the contract by the defendant the difference between the cost of performing the contract and the amount agreed upon as compensation, including as

part thereof the market value of the top soil, after deducting the reasonable expense of marketing the same. It follows that the judgment should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., GRAY, HAIGHT, WERNER, WILLARD BARTLETT and CHASE, JJ., concur.

Judgment reversed, etc.