**BEAUMONT BIRCH COMPANY,**
Plaintiff,

v.

**NAJJAR INDUSTRIES, INC., Coppola Bros. Excavation Corp. and Najjar Industries Inc./Coppola Bros. Excavation Corp. (A Joint Venture), Defendants.**

**BEAUMONT BIRCH COMPANY,**
Plaintiff,

v.

**CONTINENTAL CASUALTY COMPANY, National Fire Insurance Co. of Hartford, the Home Indemnity Company and the Home Insurance Company, Defendants.**

Nos. 78–Civ. 132, 78–Civ. 1950.

United States District Court,
S. D. New York.

Aug. 14, 1979.

---

Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, New York City, for plaintiff; Margot A. Metzner, New York City, of counsel.

Max E. Greenberg, Trayman, Cantor, Reiss & Blasky, New York City, for defendants; Leonard Shabasson, New York City, of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, Beaumont Birch Co. ("Beaumont"), was the subcontractor on a construction contract between defendant Najjar Industries, Inc./Coppola Bros. Excavation Corp. ("Najjar/Coppola" or "prime contractor"), a joint venture, and the City of New York for the installation of air pollution control improvements at the Greenpoint Incinerator in Brooklyn, New York. Under its subcontract with the prime contractor dated March 8, 1973, Beaumont agreed to furnish and install a flay ash removal conveyor system as part of the pollution control project. The original subcontract price of $275,000 was increased to $329,000 by a written addendum in August 1974 to cover additional costs incurred by Beaumont in the course of performance. From the date of the subcontract until November 1976 when Beaumont left the job site, Beaumont submitted invoices for labor and materials totalling $324,000 to the prime contractor for which it was paid $222,750. As of December 31, 1976, the City declared the prime contractor in default on the construction project.[1] Claim-

---

1. Najjar/Coppola, contending that the City delayed approvals for proposed equipment resulting in escalating prices and that as a consequence it became financially unable to complete the project and stopped work thereon, commenced an action against the City which is still pending in the state courts. Defendant's financial difficulties and its dispute with the City do not excuse it from liability in damages for failure to perform its contract with plaintiff.

ing that the uncompleted portion of the subcontract work is miniscule and that full performance was prevented, through no fault on its part, but because of delays and interferences occasioned by other subcontractors and by the prime contractor's financial inability to complete the project which led the City to declare the contractor in default, plaintiff commenced this action to recover $101,250, the difference between its billings and the amount it received. Beaumont also seeks recovery from the sureties on the payment bonds under the contract. Defendant Najjar/Coppola asserts that all monies due to plaintiff have been paid in accordance with contract terms and counterclaims for approximately $35,000 as the cost of correcting plaintiff's alleged deviation from specifications in providing the heat tracer system portion of its subcontract.

■ On all the evidence submitted in this case, it cannot seriously be disputed, and defense counsel tacitly acknowledged as much in his closing argument, that plaintiff has proved substantial performance and is entitled to some recovery in addition to the amounts already paid.[2] The New York rule[3] of damages on a construction contract where there has been substantial performance is clear—plaintiff may recover the contract price less the cost of completion and the cost of correcting defects.[4] The controversy lies in determining the precise amount of damages.[5]

With respect to the cost of completing the subcontract, Beaumont contends that its invoices of $324,000 represent the value of work already performed and that $5,000, the difference between that sum and the contract price of $329,000, equals the cost of completion. That assertion is too simplistic. The written addendum adding $54,000 to the contract price is indicative of the cost overruns previously experienced on this project. In February 1977, Beaumont advised the City that it would take two to three weeks to complete erection of the conveyor system. Another item to be considered is the expense of maintaining the system until the entire project was operational and training of City Sanitation Department personnel thereafter, for which the subcontractor was responsible. The testimony of other witnesses connected with the project indicates the $5,000 figure is unrealistic.

In contrast, defendant's estimate of completion costs is inflated. The president of the joint venture, Elisha Najjar, testified that it would take three to four months to complete installation at a labor cost of $45,000, plus an additional $8,000 to $10,000 for materials. Added to this would be the cost of maintenance and training referred to above. His testimony is undermined by that of Balu Kamat, presently employed by defendant but who previously was a resident engineer with the City's construction management engineering firms on the project until January 1976. Kamat stated

---

*407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.,* 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 344, 244 N.E.2d 37, 41 (1968); *Pettinelli Elec. v. Board of Educ.,* 56 A.D.2d 520, 391 N.Y.S.2d 118, 119 (1st Dep't 1977).

**2.** *See Tibbetts Contr. Corp. v. O. & E. Contr. Co.,* 15 N.Y.2d 324, 258 N.Y.S.2d 400, 206 N.E.2d 340 (1965); *Jacob & Youngs v. Kent,* 230 N.Y. 239, 129 N.E. 889 (1921); *Turk v. Look,* 53 A.D.2d 709, 383 N.Y.S.2d 937, 939 (3d Dep't 1976).

**3.** Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332(a). The parties agree New York law applies.

**4.** *New Era Homes Corp. v. Forster,* 299 N.Y. 303, 307, 86 N.E.2d 757 (1949); *Long Is. Contracting & Supply Co. v. City of N. Y.,* 204 N.Y. 73, 82–83, 97 N.E. 483 (1912); *Alm v. Unified Church Structures, Inc.,* 61 A.D.2d 886, 403 N.Y.S.2d 151, 153 (4th Dep't 1978); *Turk v. Look,* 53 A.D.2d 709, 383 N.Y.S.2d 937, 939 (3d Dep't 1976); *Shapiro v. Mollat,* 168 N.Y.S. 723, 724 (Sup. 1st Dep't 1918).

**5.** Plaintiff bears the burden of proving its damages. *Spence v. Ham,* 163 N.Y. 220, 57 N.E. 412 (1900); *accord, Lewis v. Barsuk,* 55 A.D.2d 817, 389 N.Y.S.2d 952 (4th Dep't 1976); *Blanchard v. City of Saratoga Springs,* 241 App.Div. 193, 271 N.Y.S. 573, 575 (3d Dep't 1934); *Klinick v. 66 East 80 Realty Corp.,* 15 Misc.2d 911, 185 N.Y.S.2d 1009 (Sup.Ct.), *aff'd,* 9 A.D.2d 871, 193 N.Y.S.2d 1006 (1st Dep't 1959).

that as of the time he left the job site, the outstanding work on Beaumont's subcontract required ten to twelve weeks to complete at a labor cost of $37,500. But it is undisputed that plaintiff continued to perform until November 1976, with the exception of a three-month period in which its plant was on strike, and Kamat had no knowledge of plaintiff's activities between January and November 1976.

■ The only objective evidence of the portion of the subcontract work that was completed is the estimate of the City's engineers. Under the City's contract with the prime contractor, the City's engineers periodically estimated for payment purposes the value of each item of work actually performed in relation to the price the City placed on the completed subcontract. The City valued this subcontract at $240,000 and as of the last requisition in August 1976 estimated that 90% of the subcontract had been completed.[6] It thus withheld authorization for payment of the remaining 10% of $24,000. Walter Berkowitz, a City senior electrical engineer, who was familiar with matters pertaining to the project, testified this retainage was ample to cover the cost of completion. Although plaintiff challenges this figure as not reflecting work performed in the months between the requisition date and November 1976, Beaumont's strike continued until early October and the only evidence it offered of additional performance after that date was a packing list showing shipments of various spare parts and transformers to the site in October.[7] No value was provided for the spare

parts, and the transformers are relevant only to correction of the heat tracer problem discussed below, not to the remaining work on the subcontract. The Court finds that the reasonable cost to complete the subcontract is $24,000.

■ There remains for consideration defendant's claim that plaintiff deviated from contract specifications in installing the heat tracer portion of the conveyor system and the consequent expenses involved. The contract called for 480 volt cable; it is undisputed that plaintiff installed 120 volt cable. The evidence establishes that the deviation was based on a good faith interpretation of the contract and that defendant accepted plaintiff's suggested resolution of the problem.[8] Although plaintiff's nonwillful deviation and defendant's acquiescence in the proposed solution prevents a forfeiture of the contract price, defendant is nonetheless entitled to compensation for additional costs to be incurred as a result of the change.[9]

The City's electrical contract for the project provided for 480 volt wire to be run from a single power panel to thermostats on each of plaintiff's twenty-eight conveyors; the conveyors themselves were to be equipped by Beaumont with 480 volt heat cable, but all electrical wiring was excluded from its subcontract. By the time all concerned realized that Beaumont was mistakenly furnishing 120 volt rather than 480 volt cable, the power panel and 480 volt wires had been installed by the electrical contractor, Expert Electric, Inc.; only the connections to the conveyors themselves re-

6. "If it can be determined with reasonable exactness what proportion of the whole work has been done the same result [as under the contract price less cost of completion rule] is reached by allowing recovery of that proportion of the price plus the profit to be expected from performing the remainder of the work." Williston on Contracts § 1363 at 3824 (1938); see Tibbetts Contr. Corp. v. O. & E. Contr. Co., 15 N.Y.2d 324, 258 N.Y.S.2d 400, 206 N.E.2d 340 (1965).

7. Plaintiff's final invoice dated December 30, 1976 was for $9,980. The one preceding that was submitted August 29, 1975, predating the City's determination of 90% completion.

While the last invoice may have included the October shipment, there was no testimony to that effect and the invoice itself provides no breakdown of labor or materials covered.

8. Although defendant accepted the resolution, it repeatedly insisted that plaintiff must assume any additional costs.

9. Arc Elec. Constr. Co. v. George A. Fuller Co., 24 N.Y.2d 99, 103, 299 N.Y.S.2d 129, 132, 247 N.E.2d 111, 113 (1969); see Jacob & Youngs v. Kent, 230 N.Y. 239, 129 N.E. 889 (1921); Turk v. Look, 53 A.D.2d 709, 383 N.Y.S.2d 937, 939 (3d Dep't 1976).

mained to be done. Because plaintiff had already assembled 75% of the heat cable into the conveyor system and the cost of disassembly would be prohibitive, two solutions were proposed. One suggested by the City required removal and replacement of the installed power panel and provision of a step-down transformer to be located next to the new panel; the branch circuitry would then be extended from the panel to the conveyor thermostats. The estimated cost of additional work required by this proposal was $35,185. The president of Expert Electric, Frank Micelotta, testified that if the transformer were provided the cost estimate would be reduced to $20,000.

The other solution suggested by Beaumont and accepted by defendant required plaintiff to provide individual transformers to be mounted on the side of each of the twenty-eight conveyors next to the thermostat. Plaintiff supplied the transformers at its own expense. The only evidence of the additional costs necessitated by this solution was offered by Elisha Najjar. He estimated that the labor and scaffolding costs for mounting the transformers on the conveyors ranged from $9,800 to $12,880. As to the cost of the electrical wiring, he relied solely on Micelotta's earlier testimony with respect to the electrical costs of the City's proposal if the transformer was supplied— that is, $20,000.

While Najjar's estimate of the cost of mounting the transformers to the conveyors appears reasonable, his reliance on Micelotta's estimate of the electrical costs is misplaced. Micelotta's testimony referred to a completely different solution to the problem which required much more extensive electrical work, including the replacement of the installed power panel. In contrast, plaintiff's solution utilized the previously completed electrical work. The only change required was that instead of running the wire directly from the panel to the thermostats on the conveyors, the wire would first be connected to the transformer, then an additional small section of wire would be needed to connect the transformer to the thermostat.

In determining the cost of correcting the heat tracer problem, the Court is again guided by the City's estimates which are within the range suggested by Najjar. Thus in addition to withholding 10% of the subcontract value of $240,000 as the cost of completion, the City retained 5% or $12,000 to cover the cost of corrective work. The $12,000 figure is within the upper range of the labor costs projected by Najjar and should be sufficient to cover the minor additional electrical work required.

In sum, plaintiff may recover the following:

| | |
|---|---|
| Contract Price: | $329,000 |
| Less Payments Made: | 222,750 |
| Subtotal: | 106,250 |
| Less Completion Costs: | 24,000 |
| Subtotal: | 82,250 |
| Less Correction Costs: | 12,000 |
| Total Recovery: | $ 70,250 |

Interest shall be computed at six percent per annum from February 5, 1977, the date by which defendant has failed to pay invoices submitted previously to it.[10] Because the

10. Plaintiff asserted alternative theories of recovery of the $101,250 claimed. On its quantum meruit theory, plaintiff correctly notes that when the defaulting party has prevented full performance or repudiated, abandoned or waived the written contract, *Knoll v. Cape Cod Sea Food Restaurant, Ltd.*, 35 A.D.2d 976, 317 N.Y.S.2d 923, 925 (2d Dep't 1970), aff'd mem. 35 N.Y.2d 917, 364 N.Y.S.2d 901, 324 N.E.2d 368 (1974); *La Rose v. Backer*, 11 A.D.2d 314, 203 N.Y.S.2d 740, 745–46 (3d Dep't 1960), aff'd, 11 N.Y.2d 760, 226 N.Y.S.2d 695, 181 N.E.2d 632 (1962); *Abinet v. Mediavilla*, 5 A.D.2d 679, 169 N.Y.S.2d 231 (2d Dep't 1957), the non-defaulting contractor has the right of election to sue for breach of contract or in quantum meru-

it for the work, labor and services performed and materials furnished, *Raile v. Peerless American Prods. Co.*, 192 App.Div. 506, 182 N.Y.S. 721, 723 (1st Dep't 1920); see *Paterno & Sons, Inc. v. Town of New Windsor*, 43 A.D.2d 863, 351 N.Y.S.2d 445 (2d Dep't 1974); *Klinick v. 66 East 80 Realty Corp.*, 15 Misc.2d 911, 185 N.Y.S.2d 1009 (Sup.Ct.), aff'd, 9 A.D.2d 871, 193 N.Y.S.2d 1006 (1st Dep't 1959). While plaintiff's invoices are some evidence of the value of work performed, the factfinder under New York law must also consider the contract price as evidence of the parties' appraisal of the value of the completed job. *Turnkey Proposals, Inc. v. Rose*, 57 A.D.2d 949, 395 N.Y.S.2d 96, 97 (2d Dep't 1977); *Smith v. Brocton Pre-*

payment bonds executed by the sureties state that they are "for the benefit of any materialman or laborer," plaintiff is entitled to judgment against the sureties on the bonds.[11]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Submit judgment accordingly.

serving Co., 251 App.Div. 102, 296 N.Y.S. 281, 283 (4th Dep't 1937). Under that view, the award above, which represents a fair apportionment of the work done against the total contract price, fully compensates plaintiff under its quantum meruit claim.

Plaintiff's theory of account stated is unsupported on the evidence. Both by contract terms and the custom in the industry, the prime contractor was not expected to accept or reject individual invoices but rather submitted periodic requisitions to the City which were subject to the approval of its engineers based upon their inspections and determination of the percentage of work actually performed. To the extent an account was stated then, it was only as to the 90% of the invoices approved for payment. Cf. Tibbetts Contr. Corp. v. O. & E. Contr. Co., 15 N.Y.2d 324, 258 N.Y.S.2d 400, 206 N.E.2d 340 (1965). As to the alleged defect in performance, defendant clearly stated its objection and its intent to hold plaintiff to any additional costs incurred.

11. Public Improvements, Inc. v. Jack Parker Constr. Corp., 59 A.D.2d 671, 398 N.Y.S.2d 427 (1st Dep't 1977); Schuler-Haas Elec. Corp. v. Aetna Cas. & Sur. Co., 49 A.D.2d 60, 371 N.Y. S.2d 207 (4th Dep't 1975), aff'd, 40 N.Y.2d 883, 389 N.Y.S.2d 348, 357 N.E.2d 1003 (1976).