In re E.C. ERNST, INC., E.C. Ernst Midwest, Inc., E.C. Ernst International Corp., Debtors,

E.C. ERNST, INC., Plaintiff,

v.

GRUMMAN ECOSYSTEMS CORPORATION, Defendant.

Arrangement No. 78 B 2139 EJR.

United States Bankruptcy Court, S.D. New York.

Nov. 2, 1983.

Shea & Gould, Friedman & Gass, P.C., New York City, for debtors and debtors in possession.

Layton & Sherman, New York City, for defendant.

DECISION ON TRIAL OF THE ISSUES

EDWARD J. RYAN, Bankruptcy Judge.

On December 1, 1978, E.C. Ernst, Inc. (Ernst) filed a petition for reorganization pursuant to Chapter XI of the now moribund Bankruptcy Act of 1898. By order of this court dated December 4, 1978, Ernst was authorized to continue in the operation and management of its business and property as a debtor in possession. Ernst is an electrical contractor involved in industrial, commercial, and governmental work.

Grumman Ecosystems Corporation (Grumman) is a Delaware corporation with its principal place of business in New York. From 1977 through 1981 Grumman was in the business of designing and constructing waste-water treatment plants and solid waste disposal facilities.

In 1977, Grumman entered into a contract (the general contract) with the Hampton Roads Sanitation District (the owner), whereby Grumman agreed to act as the general contractor for a project known as the Army Base Waste-water Treatment Plant, Phase II (the project). The project consisted of the reconstruction of some existing facilities and construction of new concrete facilities in Hampton Roads, Virginia.

In mid-1977 Grumman solicited bids from subcontractors for the construction of the electrical phases of the project. On December 16, 1977 Grumman entered into a contract with Ernst (the subcontract) whereby Ernst agreed to "furnish all necessary material, labor, equipment and small tools of the trade to perform all work titled, 'Electrical' as listed under Sections 16A 16B, 16C and 16D" of the specifications set forth in the general contract. Accordingly, Ernst was to install electrical materials such as conduit, wire, and motor control centers. Ernst's work was to be performed in structures to be constructed, as well as existing ones.

In connection with the installation of an underground electrical distribution system, Ernst was to dig the necessary trenches, install reinforcing bars over duct banks and pour concrete over those bars and duct banks. For its performance Ernst was to receive the "fixed price" of $1,164,000 through a series of progress payments.

The subcontract incorporated by reference the terms of the general contract, and the general contract specifications. The subcontract provided that Ernst was to commence work within forty-eight hours notice by Grumman. The general contract provided that the project was to be completed in nine hundred consecutive calendar days, and that time was to be considered to be of the essence of the contract.

Ernst received its notice to proceed on or about September 12, 1977. On or about December 12, 1979, Ernst terminated its performance on the project.

On April 24, 1981 Grumman filed with this court a proof of an administrative claim for $693,720.41 representing the damages claimed to have been suffered by Grumman as a result of Ernst's alleged breach of the subcontract.

On July 10, 1981 Ernst instituted the instant adversary proceeding seeking expungement of Grumman's claim and counterclaiming for $156,368, which represents unpaid sums due Ernst upon the subcontract and profits Ernst would have earned, but because of Grumman's conduct, did not. The lost profits claim has not been proven and is found to be abandoned.

An extensive trial was held in this court beginning April 13, 1983. At the close of trial, the matter was bifurcated and the parties submitted proposed findings of fact and conclusions of law on the issue of liability.

Grumman's claim is based upon Ernst's alleged breach of the subcontract. Accordingly, Grumman has the burden [1] of proving each element of an action for breach of contract, which are: (1) Formation of a contract between plaintiff and defendant; (2) performance by plaintiff of any depend-

---

1. Ordinarily, a proof of claim has prima facie validity which the debtor or debtor in posses-sion must rebut. However, at trial, Grumman waived this technical advantage.

ent conditions or conditions precedent; (3) defendant's failure to perform; and (4) resulting damage to plaintiff. *Republic Corp. v. Procedyne Corp.,* 401 F.Supp. 1061, 1062, 1068 (S.D.N.Y.1975).

Grumman has failed to prove the performance of its obligations under the subcontract, which are dependent conditions. *Id.* at 1069.

Pursuant to the operating constraints of the general contract, Grumman was to maintain drainage at all times in the primary clarifier, intermediate pumping station and aeration basin area. Ernst primary work was to be done here. This area was 420 feet long and 90 feet wide and ranged in depth from ten feet along the edges to 15 feet in the center. However, Grumman was unable to maintain drainage and this area was a quagmire. Everytime it rained the project was more or less under water. At times the water in the intermediate pumping station area was as deep as ten feet. These conditions existed when Ernst abandoned the project in December of 1979.

Approximately thirty per cent of Ernst's work was to be done inside the intermediate pumping station, which was located between the two clarifiers. That structure's electrical work was scheduled to be completed many months prior to December of 1979. However, when Ernst left the project only the concrete basement slabs and walls had been poured. Ernst had done all the available work there, namely installing grounding beneath the foundation.

Grumman was also obligated to supervise, manage and schedule the work done on the project. It is apparent that Grumman was unable to perform these functions which are essential to the success of a complex construction project employing fifteen to twenty subcontractors.

Mr. George Montgomery, Ernst's branch manager, a man with 32 years' experience in electrical construction convincingly described the project "as the most screwed up job I have ever been involved in". Ernst's foreman, who had worked on large scale electrical projects for 22 years, echoed these sentiments. Grumman's failure to properly supervise the project is demonstrated by the fact that it employed five or six different project managers. At times it left the project unsupervised, and Ernst's requests for information often went unanswered.

Grumman realized its inability to manage the project properly and in the fall of 1979 Grumman hired Perini Construction Company to perform the construction management functions for it. Grumman lost over five million dollars on its sixteen million dollar general contract. In the Spring of 1979 Grumman decided, wisely to be sure, to get out of the wastewater treatment plant construction business. As Mr. Montgomery knowingly testified, "[Grumman] had been better off sticking to building aircraft."

An implied condition in a contract to perform electrical work in buildings is that the buildings exist. When Ernst left the project, the construction of buildings and structures had progressed very little. Grumman failed to perform this implied condition.

Grumman's failure to comply with conditions precedent to the contract constitutes a complete bar to its recovery for Ernst's alleged breach. *See Holland Industries, Inc. v. Adamar of New Jersey,* 550 F.Supp. 646, 648 (S.D.N.Y.1982); *Marx & Co., Inc. v. Diner's Club, Inc.,* 400 F.Supp. 581, 585 (S.D.N.Y.1975).

Grumman offered no evidence to rebut or explain its failure to properly manage and supervise the project or to control the water problem. Rather, Grumman contends the massive delays on the project were authorized by Article VIII of the subcontract which gave Grumman the right to delay or vary the sequence of Ernst's performance.[2] However, the scope of delays imposed upon Ernst were outside the contemplation of the parties when they entered into the subcontract. *Cf. Kalisch-Jarcho, Inc. v. City of New York,* 58 N.Y.2d 377, 461 N.Y.S.2d 746,

---

**2.** Article VIII provides that:

"The contractor shall have the right, at any time, to delay or suspend the commencement or execution of the whole or any part of the work herein contracted to be done, or vary the sequence of performance.

448 N.E.2d 413 (1983). Ernst's bid was made assuming a thirty-month job. Time was of the essence in the contract. Ernst left the project approximately 26 months after receiving notice to proceed. At that point, the electrical work on the project was only nine percent complete. Article VIII of the subcontract can not exculpate Grumman from liability resulting from these delays.

Grumman's failure to supervise the project and to provide Ernst with areas in which to work constitutes a breach of the subcontract. Ernst was willing and able to perform within the time contemplated by the subcontract and expended $65,057 for materials and $111,207.25 for labor that remains unpaid. Accordingly, as a consequence of Grumman's breach, Ernst is entitled to recover these sums it expended towards performance in reliance on the subcontract. *Long Island Contracting and Supply Co. v. The City of New York,* 204 N.Y. 73, 97 N.E. 483 (1912); Restatement (second) of Contracts § 349 (1979).

Grumman has failed to prove the elements of an action for breach of contract. Therefore, its claim must be, and hereby is, expunged.

Settle an appropriate order directing entry of judgment with a proposed judgment for the clerk to enter.