In re U.S. AIR DUCT CORPORATION,
Debtor.

Harold P. GOLDBERG, Trustee,
Plaintiff,

v.

E.W. TOMPKINS COMPANY,
Defendant.

Nos. 79–BK–02454, 81–CV–1067.

United States District Court,
N.D. New York.

April 5, 1984.

Scott, Sardano & Pomeranz, Syracuse, N.Y., for plaintiff; Roger Scott, Syracuse, N.Y., of counsel.

Harder & Silber, Albany, N.Y., for defendant; George W. Harder, Albany, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Harold P. Goldberg, in his capacity as Trustee for the estate of U.S. Air Duct Corporation ("Air Duct"), a Chapter 7 debtor, appeals from an Order of the United States Bankruptcy Court for the Northern District of New York, Leon J. Marketos, B.J., dismissing his complaint after a trial thereon. *Memorandum-Decision, Findings of Fact, Conclusions of Law and Order* ("Mem.-Dec.") dated July 24, 1981.

The Trustee sought to recover $101,274.59 from E.W. Tompkins Company ("Tompkins") allegedly due and owing under two contracts involving separate construction projects. With respect to the first contract, relating to the construction of Wood County Hospital in Bowling Green, Ohio, the Bankruptcy Court concluded that although the Debtor had proven a breach of contract by Tompkins, it had failed to prove its damages from such breach. With respect to the second contract, relating to construction at Auburn Middle School in Auburn, New York, the Bankruptcy Court found that both parties failed to establish their rights under the contract. Accordingly, the court dismissed both the complaint and Tompkins' counterclaim for breach of contract.

Although this court's analysis differs from that of the bankruptcy court in certain respects, it arrives at the same conclusions and therefore adopts the proposed order, dismissing both the complaint and counterclaim.

### The Wood County Hospital Project

#### Background

The prime contractor on this hospital construction project, Hospital Building and Equipment Company ("HBE") engaged E.W. Tompkins Company as subcontractor for the installation of certain heating, ventilating, air conditioning plumbing and fire protection systems. The agreement between HBE and Tompkins, dated May 30, 1978 (Ex. B., incorporating Ex. F) required HBE to pay Tompkins $1,249,000.00 through periodic progress payments, each reflecting the percentage of the job that had been completed in that period, minus a "retainage" of 10%.

Tompkins, in turn, entered into a contract with Air Duct whereby Air Duct agreed to furnish materials and labor for certain heating, ventilating, and air conditioning systems for the sum of $233,000.00. The contract is evidenced by a single page, unsigned purchase order dated June 9, 1978, which Tompkins sent to Air Duct (Ex. 1). The purchase order does not contain any provisions with respect to progress payments. Due to mutually agreed upon change orders submitted over the course of the contract (reflecting, *inter alia,* deductions for materials that Air Duct had agreed to supply but which Tompkins actually supplied), the contract price was reduced to the sum of $219,170.23 as of June 5, 1979.

Air Duct, in turn, subsequently contracted the labor aspects of its contract, plus certain obligations to supply materials, to Fred Christen & Son ("Christen") for the sum of $135,000.00. That sum was increased to $135,927.82 pursuant to two change orders reflecting added work. The contract, set forth on an Air Duct purchase order, entitled Christen to progress payments to be made "30 days after invoice with no retainage...." (Ex. 32).

As work on the project was performed, Air Duct would submit monthly applications for progress payments to Tompkins. Frank Bean, president of Air Duct, testified that the amount sought was calculated on a cost-plus basis; i.e., prior to adjustment by Tompkins, each application reflected the cost of labor and material supplied during the payment period, plus an amount for overhead and profit. Tompkins' witnesses, however, testified that the applications were, pursuant to the contract, devised to reflect the percentage of work-in-place at the job site minus a 10% retainage, and that Air Duct's applications were evaluated on that basis. In its decision, the bankruptcy court concluded that "the facts corroborated the Debtor's version of how it

calculated its Applications." *Mem.-Dec.* at 5.

Between November 1978 and May 1979, Tompkins paid Air Duct $104,850.00 as sought in Air Duct's first six progress payment applications, reflecting work performed between September 1978 and March 15, 1979. Although the parties now dispute whether such applications overstated or understated the value of the work performed, there was no significant contemporaneous conflict in that respect.

There was, however, considerable friction between Tompkins and Air Duct during that period with respect to the length of time between Air Duct's submission of its progress payment applications and payment of the same. The record adduced at trial reveals that the number of days between submission and payment for the six payments made were 53 days, 19 days, 75 days, 42 days, 45 days, and 54 days, respectively. *See Mem.-Dec.* Chart I, at 7.

Meanwhile, the Debtor was receiving bills from its subcontractor, Christen, on about the 15th of each month, and was obligated to pay each bill within 30 days. Since Air Duct was dependent upon funds it received from Tompkins to pay Christen, in Judge Marketos' words "an incongruity existed between the Debtor's receipt of monies from Tompkins, consuming a minimum of 45 days, and the 30-day due date of payment to Christen." *Mem.-Dec.* at 6. This "incongruity" led to a situation in which, by May 2, 1979, Air Duct's Application # 6 to Tompkins for a progress payment of $33,705.00 had been outstanding for 48 days, while Christen's Application # 3 to Air Duct for a progress payment of $21,900.00 had been outstanding for 50 days.

On May 2, Tompkins forwarded a check to Air Duct for $33,705.00, in full payment of Application # 6. Air Duct, however, did not promptly remit the progress payment due Christen. On May 14, after Christen had taken its work force from the site for nonpayment of its application, Tompkins unilaterally forwarded a check for $21,900.00 payable to Christen. Thereupon, Christen's forces returned to the job site.

By letter dated May 22, Tompkins informed Air Duct that it had paid Christen on Air Duct's behalf, and that it "will reduce the value due on U.S. Air Duct's next progress payment by the value of our advanced payment to ... Christen...." (Ex. Z). It further notified Air Duct that "[f]uture payments on this project will be issued in a check payable to U.S. Air Duct and Christen & Son Co." *Id.*

Air Duct responded by ceasing its work on the project on May 25, advising Tompkins that "under no circumstances will we continue to operate in the manner imposed upon us for the past several months." (Ex. AA). Inasmuch as Christen continued to perform, Air Duct's purported suspension of work did not, for the moment, amount to any actual interruption of the performance required by its contract.

As of May 25, the date of Air Duct's announced suspension of work, Tompkins was in receipt of two applications for progress payments, totaling $45,984.17, for work performed by Air Duct and its subcontractor through May 15. Thus, as the bankruptcy court noted in its decision, even after crediting Tompkins for the cash advance of $21,900.00 that it had previously made to Christen, "the Debtor had a present claim to Tompkins for $24,084.17." *Mem.-Dec.* at 11. Subsequently, Air Duct submitted two more progress payment applications to Tompkins, seeking $28,990.43 for the period of May 15 through July 25.

Notwithstanding Tompkins' assertion that it would henceforth pay Air Duct's applications by a check payable to both Air Duct and Christen, Tompkins ignored all pending and subsequent applications by Air Duct, and commenced making direct payments to Christen based on the amounts Christen sought in its applications to Air Duct. From Tompkins' point of view, it was simply attempting to gradually recoup the $21,900.00 "advance" it had made on Air Duct's behalf by withholding Air Duct's portion of each of Air Duct's applications, and remitting the balance attributable to Christen's labor directly to Christen. From Air Duct's perspective, how-

ever, Tompkins was attempting to eliminate Air Duct's function altogether, and thereby avoid paying it the overhead and profit it was entitled to under the contract.

In mid-July, Tompkins and Christen began demanding that Air Duct supply them with certain coordinated shop drawings and "spiral duct," which were needed at the job site. Air Duct consistently responded that it would not ship any materials until the past due balances on its account were paid. As a result of this impasse, on August 31 Tompkins wrote to Air Duct, cancelling the contract on the ground that "your firm failed to provide spiral duct and your subcontractor, The Fred Christen & Son Co., refuses to perform labor because same claims you are in the process of bankruptcy". (Ex. FFF). Air Duct responded by letter that the cancellation "was caused entirely by E.W. Tompkins Company's failure to pay current and past due invoices due U.S. Air Duct Corporation". (Ex. 24).

Following the cancellation of the Tompkins-Air Duct contract, Tompkins entered into a contract with Christen whereby Christen would complete the project for $48,810.00.

### Discussion

In reviewing the decision below, the court "need give no deference to the findings of the bankruptcy judge," and "may accept, reject, or modify, in whole or in part," the bankruptcy court order. *Emergency Resolution of the United States District Court, Northern District of New York, December 24, 1982* ¶ (e)(2)(B).[1]

Analysis of this dispute must begin by ascertaining the scope and content of the Tompkins-Air Duct contract. Since both

---

1. On August 1, 1983, the new Bankruptcy Rules prescribed by the Supreme Court became applicable to all pending proceedings, except where such application "would not be feasible or would work injustice." Order of April 25, 1983. See 103 S.Ct. (Special Section). New Rule 8013, which essentially duplicates previous Rules 752 and 810 provides:

   On appeal, the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order or decree or remand with instructions for further proceedings. Findings of Fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.

   In this case, however, a different standard of review applies, due to the Supreme Court decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) and an *Emergency Resolution* adopted by this district on December 24, 1982, to comply with that decision. In *Marathon, supra,* the Supreme Court determined that bankruptcy judges could not be empowered to make final determinations in matters "related to cases under title 11" that could have been brought in a district court or a state court. *See, In re Kaiser,* 722 F.2d 1574, 1580 (2d Cir.1983). In response, this and other districts throughout the federal system have promulgated emergency resolutions in order "to use the structure for bankruptcy adjudication left intact by *Marathon* and to sustain life in the congressionally mandated bankruptcy scheme." *Id.,* at 1579. *See also, In Re Turner,* 29 B.R. 419 (N.D.N.Y.1983), *rev'd on other grds.,* 724 F.2d 338 (2d Cir.1983).

   Under the Emergency Resolution, which is applicable "to all bankruptcy cases and proceedings ... filed on or after October 1, 1979," id., ¶ (h), such cases and proceedings are deemed referred to the bankruptcy judges of this district. *Id.* ¶ (c)(1). With respect to "related proceedings," i.e., "civil proceedings that, in the absence of a petition in bankruptcy could have been brought in a district or a state court," id. ¶ (d)(3)(A), the bankruptcy judge is empowered to "submit findings, conclusions, and a proposed judgment or order to the district judge...." *Id.* ¶ (d)(3)(B). Once submitted, review of a proposed judgment or order in a "related proceeding" is to be conducted in accordance with the standard set forth in ¶ (e)(2)(B):

   In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order of judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge. At the conclusion of the review, the district judge shall enter an appropriate order or judgment.

   Air Duct filed its chapter 7 petition on November 15, 1979, and this adversary proceeding commenced thereafter. The proceeding involves contract claims that are "related to" a case under title 11 within the meaning of 11 U.S.C. § 1471, but which, "in the absence of a petition in bankruptcy could have been brought in a district or a state court." *Emergency Resolution* ¶ (d)(3)(A). Accordingly, the standard of review set forth in ¶ (e)(2)(B) of that *Emergency Resolution* is applicable here.

parties to the contract are New York corporations, and the contract was evidently created in New York, its scope and content will be determined in accordance with the substantive law of New York, "the jurisdiction having the greatest interest in the litigation." *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 237 N.E.2d 877 (1968).

The parties agree that they are bound by the terms set forth in the one page purchase order that Tompkins sent to Air Duct (Ex. 1), but they vigorously dispute what additional obligations and terms are included in their agreement. The dispute centers on the meaning of Air Duct's express obligation, pursuant to the purchase order, to "FURNISH AND INSTALL PER PLANS AND SPECIFICATIONS ALL SHEET METAL WORK...." The term "SPECIFICATIONS" is ambiguous, since it could refer, as Tompkins contends, to a document entitled "Specification for Construction Alterations and Additions to Wood County Hospital, Bowling Green, Ohio," (Ex. F), thereby incorporating by reference all of the pertinent contractual terms in that document; or it could refer, as the Trustee insists, only to those provisions in Exhibit F that set forth the specific technical instructions to be followed by Air Duct in fabricating and installing the sheet metal. If the purchase order incorporates Exhibit F generally, then Air Duct is bound by various "General Conditions" set forth in that document, including provisions governing progress payments to subcontractors.

The bankruptcy court resolved this ambiguity in favor of general incorporation, reasoning that even if Air Duct had only agreed to perform in accordance with the technical instructions, those instructions incorporated through successive references the "General Conditions" in that document.[2]

■ In this court's view, however, ordinary rules of contract construction warrant a conclusion that Air Duct is not bound by the "General Conditions" in Exhibit F. First, unless a different intention is shown, contract language is interpreted in accordance with its generally prevailing meaning. *Restatement (Second) of Contracts* § 202(3)(a) (1979); *N.Y.Jur.2d* Contracts § 212 (1982), *citing, Mencher v. Weiss*, 306 N.Y. 1, 114 N.E.2d 177 (1953). It has been decided in numerous cases that the term "specifications," as used in the phrase "plans and specifications" in the building construction context means "a detailed statement of each particular part of the work to be done, usually prepared by the architect in amplification of the details of drawings or plans." *Fowler v. Bushby*, 69 Misc. 341, 125 N.Y.S. 890, 891–92 (S.Ct. App. Term 1910). *See also*, 39A *Words & Phrases* "Specifications" (West) *and the cases cited therein*. That meaning should prevail, absent a showing that the parties intended otherwise.

■ Moreover, the principle that ambiguities in contract language should be construed against the draftor, *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975); *Restatement (Second of Contracts), supra*, § 206, would, in this instance, justifiably bind Tompkins to the narrower

---

**2.** To be specific, the bankruptcy court concluded that Air Duct agreed, at the very least, to follow the Heating, Ventilation and Air Conditioning instructions set forth in section 15.2 of Exhibit F. Those instructions provide:

15.2–01 *General Notes and Scope*
A. This contractor shall refer to the General Mechanical Section 15.1 as it is part of this section.

The Mechanical Section then states:

15.1.01 *General Notes and Scope*
A. All work under this section is subject to the Contract Documents and the contractor shall be responsible for and governed by all requirements thereunder.

B. All Division 15 mechanical contractors are required to refer to this section as it is a part of his division of work and is pertinent to these contracts.

The term "Contract Documents" is explained in section 1.1.1:

1.1.1 *Contract Documents*
The contract consists of: this document; the Agreement between the Owner, the Architect and HBE; all Drawings, Specifications and other documents enumerated therein; and all Modifications thereto....

The "Contract Documents" therefore included the "General Conditions", which appear in the first division of Exhibit F.

meaning of the term, "specifications." Had Tompkins meant to require Air Duct to adhere to the general contract terms in the extraneous document, it could simply have provided in its purchase order that Air Duct "furnish and install all sheet metal work in accordance with the terms, plans and specifications in the 'Specification for Construction Alterations and Additions to Wood County Hospital, Bowling Green, Ohio.'" *See Buchman Plumbing Co. v. Regents of Univ. of Minn.*, 298 Minn. 328, 215 N.W.2d 479 (1974) (the phrase "plans and specifications" coupled with identification of the extraneous document incorporates all terms in that document.) In short, the purchase order language lacked sufficient specificity to effect an incorporation by reference of the General Conditions in Exhibit F. *See Scott & Williams Inc. v. Pittston Stevedoring Corp.*, 422 F.Supp. 40, 42, n. 6. (S.D.N.Y.1976) (collecting cases exhibiting similar problem).

■ Nor can this court agree with the bankruptcy court that the "General Conditions" are incorporated by successive references. As the Supreme Court held in *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916), "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." The bankruptcy court acknowledged this principle, *Mem.-Dec.* at 20, but apparently found it inapplicable. In this court's view, however, the principle requires a finding that Exhibit F is incorporated only to the extent that it sets forth "plans and specifications," i.e., technical instructions, pertaining to the sheet metal work Air Duct contracted to perform. The purchase order referred to an extraneous writing (i.e., the "plans and specifications") only for a specified purpose (i.e., "furnish and install ... all sheet metal work"). Although Tompkins may have intended to bind Air Duct to the General Conditions in Exhibit F, there is no evidence that Tompkins expressed that intent or that Air Duct was aware of it; Air Duct therefore cannot be bound by such conditions. *Restatement (Second) of Contracts, supra,* § 201(2)(b).[3]

Accordingly, the contract between Tompkins and Air Duct is comprised of those terms set forth in the purchase order and in the "plans and specifications" in Exhibit F without further incorporations by reference (both as modified by subsequent mutual agreements) and any other terms agreed upon by the parties or implied as a matter of law.

■ Neither the purchase order nor the plans and specifications contain any provision for periodic progress payments, but the parties mutually intended that such payments were to be made, and their course of conduct confirms that understanding. However, there was no such mutual understanding with respect to the *time* such payments were due. Where no provision is expressed in a contract as to the time a performance is due, a reasonable time is implied. *New York v. N.Y.C.R. Co.*, 275 N.Y. 287, 9 N.E.2d 931 (1937).[4] *See also, Restatement (Second) of Contracts, supra,* § 204 comment (d); *NY Jur.2d Contracts* § 244. The determination of what amount of time is "a reasonable time" is ordinarily a question of fact, involving consideration of "the subject matter of the contract, the situation of the parties, their intention, what they contem-

---

3. *Restatement (Second) of Contracts* § 201...
   (2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made...
   (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

4. Because the bankruptcy court determined that the Tompkins-Air Duct contract incorporated all

of the "General Conditions" of Exhibit F, it gave effect to a choice of law provision in that document, and consequently construed the contract in accordance with Ohio law.

This court, however, has determined that the Tompkins-Air Duct contract does not include the "General Conditions" of Exhibit F. Accordingly, the law of New York, the jurisdiction with the greatest interest in the dispute, applies for the purpose of construing the contract.

plated at the time the contract was made, and the circumstances attending the performance of it." *Hills v. Melenbacher,* 23 A.D.2d 803, 258 N.Y.S.2d 243, 244 (4th Dept.1965) *citing, inter alia, A.B. Murray Co. v. Lidgerwood Mfg. Co.,* 241 N.Y. 455, 459, 150 N.E. 514 (1926).

■ Air Duct knew, or should have known, at the time it agreed to become a sub-sub-contractor on the project, that its progress payment applications would undergo a several stage process of approval (Air Duct to Tompkins to HBE to the owner) and a several stage descent before payment (the owner to HBE to Tompkins to Air Duct). As the bankruptcy properly found, based on the evidence adduced at trial, "a minimum of forty-five (45) days had to transpire between (a) the Debtor's submission of payment applications and (b) the ability of Tompkins to secure payment from HBE." *Mem.-Dec.* at 23. Thus, under the circumstances existing when the Tompkins-Air Duct contract was created, 45 days would constitute "a reasonable time" for remittance of a progress payment. That period is therefore an implied term of the Tompkins-Air Duct contract. In so finding, the court fully recognizes that Air Duct subsequently obligated itself to make payments to Christen within 30 days of each application. However onerous that obligation was, it was in no way binding on Tompkins, and could not retrospectively alter the reasonability of the 45-day period vis-a-vis Tompkins and Air Duct.

■ Hereafter, this court's findings and conclusions largely coincide with those of the bankruptcy court. As of May 8, 1979, the date Air Duct deposited Tompkins' payment of Application # 6, Tompkins was current in its progress payments and Air Duct was continuing to perform: the contract was fully operative. However, by failing to pay Christen, thereby causing Christen to justifiably suspend performance on May 14, Air Duct furnished sufficient ground for being deemed in breach of contract. Moreover, by announcing on May 25 that it was suspending its own performance, without sufficient justification, Air Duct furnished a further basis for Tompkins to declare a default.

■ Nevertheless, as the bankruptcy court found and as this court's review of the evidence reveals, Tompkins firmly elected to treat the Tompkins-Air Duct contract as operative, subject to its asserted right to a credit for its advance to Christen. Thus, Tompkins informed Air Duct that it would reduce future progress payments, and make them payable to both Air Duct and Christen. It also treated the contract as operative by unilaterally submitting change orders 10 and 11, further reducing the contract price that was payable to Air Duct. Finally, Tompkins confirmed its view of the contract's viability by insisting on Air Duct's performance in July and August, leading to its notice of cancellation on August 31 for Air Duct's failure to perform.

A peculiar circumstance of this case is that Air Duct had subcontracted the labor aspects of its contract to Christen, which steadfastly performed once it received its $21,900.00 payment on May 18. Thus, Air Duct's purported suspension of work announced on May 25 was essentially meaningless; its contractual duties were, for the moment, being fully performed by its subcontractor. It therefore becomes understandable that Tompkins would elect, until August 31, to ignore Air Duct's purported suspension and treat the contract as in force.

The contract principle governing Tompkins' obligations under these circumstances is accurately stated in *NY Jur.2d:*

> The action of a party in refusing to recognize a breach and in insisting upon performance leaves it open to the other party to fulfill his contract.... If one party to a contract continues performance after a breach by the other, he must continue on the contract terms. Wherever a contract not already fully performed on either side is continued in spite of a known excuse, any defense based thereon is lost and the injured party is himself liable if he subsequently fails to perform.

*NY Jur.2d* § 375.

■ By treating the contract as operative and insisting upon Air Duct's perform-

ance, Tompkins waived any immediate ground for declaring Air Duct in default, and obligated itself to perform in accordance with the contract terms. As the evidence clearly indicates, and as the bankruptcy court found, Tompkins failed to make a timely payment of Air Duct's Application # 7 and each application thereafter. Where, as here, failure to make agreed upon progress payments prevents performance by the subcontractor, it is a material breach that justifies suspension of performance by the subcontractor. *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 248 U.S. 334, 345, 39 S.Ct. 102, 106, 63 L.Ed. 275 (1918). Since Air Duct submitted its application on April 16, Tompkins was in breach as of May 31, the date that "a reasonable time", i.e., 45 days, expired.

■ This court also agrees with the bankruptcy court that direct payments by Tompkins to Christen did not constitute performance of Tompkins' contractual obligations. The contract contemplated payments to Air Duct, and did not allow unilateral modification. As the bankruptcy court observed, if Tompkins required assurances that Christen would be promptly paid, there were various means of securing such assurances without violating the terms of the contract.

Thus, while Air Duct's announced suspension of performance on May 25 was premature, it was not treated as a default by Tompkins. Subsequently, on May 31, the suspension became justified and Air Duct became entitled to sue for damages.

■ With respect to damages, the bankruptcy court held that Air Duct could recover if it established that "[its] remaining cost to complete the contract was less than the contract price minus the sum of (1) previously paid progress payments plus (2) any and all expenses paid on [its] behalf to date." *Mem.-Dec.* at 27. This statement of the applicable measure of damages is correct, *see Long Island Contracting & Supply Co. v. City of New York*, 204 N.Y. 73, 81–82, 97 N.E. 483 (1912), and would "put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." *Adams*

*v. Lindblad Travel, Inc.*, 730 F.2d 89 at 92 (2d Cir.1984). Applying that standard, the court determined that Air Duct failed to prove that it would have realized any profit. This court agrees with that determination.

The contract price, after mutual adjustments, was $219,170.23; previous progress payments to Air Duct totaled $104,850.00; Tompkins also made a $21,000.00 payment to Christen on Air Duct's behalf prior to breaching the contract, and it is entitled to credit for that amount. Thus, Air Duct may recover to the extent that its cost to complete the contract was less than $92,-420.23 ($219,170.23 ± [$104,850.00 + $21,-900.00]).

Certain elements of the cost to complete can be deduced with reasonable certainty. First, since Air Duct hired Christen to perform all the labor for a lump sum of $135,-927.82, Air Duct's cost to complete the labor aspect of its contract could ordinarily be determined by calculating the balance due on the Air Duct-Christen subcontract: $77,380.82 ($135,927.82 less Air Duct's two payments totaling $36,647.00, less Tompkins' advance of $21,900.00). Although Tompkins proved that it later actually paid Christen far more than $77,380.82 to complete the labor, Air Duct would not necessarily be accountable for the extra amount paid.

Assuming Christen would have invoiced Air Duct only for the balance due on its contract, $77,380.82, Air Duct would also have incurred, by its own estimates, 10% of that amount in overhead costs, totaling $7,738.08.

Thus, at this stage of analysis, Air Duct's expected profit would amount to $7,301.33, as shown below:

| | |
|---|---|
| Adjusted K price: | $219,170.23 |
| less progress payments paid | −104,850.00 |
| | 114,320.23 |
| less Tompkins' advance to Christen | − 21,900.00 |
| | 92,420.23 |
| less K balance due Christen | − 77,380.82 |
| | 15,039.41 |
| less 10% overhead avoided | − 7,738.08 |
| EXPECTED PROFIT | $ 7,301.33 |

However the bankruptcy court found—and this court sees no basis for disturbing that finding—that Air Duct was responsible for certain defective or omitted materials, which required "corrective work in terms of additional material and labor" and which "further diminishes any initial profit calculations based on the contract price." *Mem.-Dec.* at 28. Had Air Duct endeavored to complete the contract, it would certainly have been obligated to supply the omitted or replacement materials, and to pay an increased amount to Christen to compensate for the extra work and delay caused by Air Duct. Although the exact amount of profit lost for this reason is indeterminate, it appears to the court that the amount would evidently exceed $7,301.33, the remaining profit calculated prior to this point.

In short, Air Duct has failed to prove that it would have realized any profit under the contract; it therefore cannot recover damages based on the contract.

However, Air Duct is entitled, as an alternative remedy, to seek the value of services performed and materials furnished in accordance with the doctrine of *quantum meruit. NY Jur.2d* Contracts § 542.

Invoking the doctrine of *quantum meruit,* the Trustee seeks to recover damages of $57,412.35, in accordance with the following calculation:

| | |
|---|---|
| Applications # 7, # 8, and ⅓ of Application # 9, for the value of work performed between March 15 and May 25 | $47,818.35 |
| Accumulated retainage as of May 25, 1979 | 17,184.00 |
| | 65,002.35 |
| LESS advance by Tompkins to Christen | −21,900.00 |
| | 43,102.35 |
| PLUS Air Duct's customary 20% mark-up on invoices submitted by Christen and paid by Tompkins between May 25 and August 31, 1979 | 14,310.00 |
| DAMAGES | $57,412.35 |

Evidently, the Trustee is seeking to recover, under the guise of *quantum meruit,* (1) the cost of the materials it furnished and the labor Christen provided plus overhead plus profit for the period prior to May 25, and (2) its overhead and profit for the period between May 25 and August 31. This measure of recovery would certainly be favorable to Air Duct, however, it bears little resemblance to *quantum meruit.*

As Corbin describes it, *quantum meruit* is "a judgment for the reasonable value of the work, labor, and materials actually rendered and used in performance of the contract before the defendant's repudiation or other vital breach." 5 Corbin on Contracts § 1094 at 513 (1964 ed.), *citing, inter alia, Clark v. New York,* 4 N.Y. 338 (1850). *See also, Smith v. Kirkpatrick,* 305 N.Y. 66, 111 N.E.2d 209 (1953). Thus, plaintiff may only recover the value of *its* performance; commissions on the services of others are not part of the recovery. *NY Jur.2d* Contracts § 511. Inasmuch as Air Duct's actual performance prior to breach consisted only of fabricating and furnishing materials, and providing administrative services with respect to its subcontracted work, it is limited to recovering the reasonable value of that work in *quantum meruit.* Moreover, the value of plaintiff's performance must be reduced by any amounts paid on account that are attributable to plaintiff's work.

To recover *quantum meruit* damages, plaintiff must meet its burden of proving performance and the value of the work or services performed. *Crane v. Baudouine,* 55 N.Y. 256 (1837). In this instance the trustee has failed to prove, with an acceptable degree of certainty, the value of its work, or even to persuade the court that the value would exceed the amounts already paid to Air Duct that were attributable to Air Duct's (as opposed to Christen's) work.

The trustee did strive to establish that its payment applications were calculated by reference to actual costs plus 10% overhead and 10% profit. Had it established that such method was carefully followed, then the reasonable value of Air Duct's work could be determined: each application, when reduced by the amount attributable to Christen's invoice and the amount attributable to the 10% profit mark-up would

reflect the value of Air Duct's manufacturing and administrative services.

However, the testimony of Air Duct president Frank Bean convinces this court that the payment applications bore at best a gross resemblance to the value of his company's work in each period. For instance, the following excerpt from cross-examination of Mr. Bean is indicative of the inexact nature of Air Duct's payment applications:

> Q. So that each of your progress payment applications merely reflects the amount of monies that you have been billed or paid to your material men, employees, suppliers et cetera, up to the given point that the payment is submitted, it that correct?
>
> A. No. I just explained to you. There is months I may want $25,000 to cover what I felt the expense on the job was in fair overhead and profit to U.S. Air Duct, and I might only get 18 or something when we get through the pencil copy. So to say that this specifically ties—you have to use the bills and the work on hand and the inspections on the job as a guide in order to fit this. This is a pretty general thing.

*Transcript* at 149.

In the instance cited above, it would appear that the application might have underestimated the value of work performed. However, Mr. Bean also acknowledged that there were some instances where the applications overstated that value. For instance, Mr. Bean acknowledged that Air Duct agreed to reduce the contract price by $17,650.00 to reflect certain items (an air balance, terminal units, and filters) that were not supplied; yet Air Duct still claimed in its Application # 10 that the work in areas that required the installation of those items was completed. In Bean's view, the discrepancy was of little importance as long as Air Duct ultimately completed all its work for the reduced contract price. In his words, inaccuracies in progress payments would eventually "wash". While that would have been true had the contract been performed to completion by both parties, after a breach the accuracy of the progress payments applica-

tions becomes crucial if they are to be considered evidence of actual cost. *Transcript* 333–338.

In short, the testimony of Bean undermines the usefulness of the Trustee's documentary evidence as to the value of Air Duct's services prior to breach. No other evidence of that value was offered.

■ Where liability has been established, and it is clear that a party has suffered damages, uncertainty as to the exact amount will not bar recovery. *In re Turner*, 29 B.R. 419, 423 (N.D.N.Y. 1983), *citing* 25A *C.J.S.* Damages § 162(1). In this instance, however, it is by no means clear that Air Duct suffered damages recoverable - on a *quantum meruit* basis. Over the course of six progress payments, Tompkins paid Air Duct $104,850.00. Out of that sum, Air Duct paid Christen $36,-647.00, leaving Air Duct a remainder of $68,203.00 attributable to the materials and services it furnished. The trustee failed to meet its burden of proof that the value of Air Duct's work on the project exceeded $68,203.00. It therefore is entitled to no recovery.

*The Auburn Middle School Project*

*Background*

Here too, Tompkins had subcontracted with Air Duct for the provision of labor and materials in connection with the sheet metal work on the project. The contract price, as adjusted by a change order, was $35,054.00. Air Duct was paid $28,685.30 in 7 progress payments; it seeks the contract balance of $6,368.70 as set forth in its final 3 applications.

Tompkins contended below that Air Duct was not entitled to the balance because it failed to perform certain "punch-list work" —assorted items requiring completion or correction—and that, as a result, Tompkins had to complete such work with its own forces. Moreover, Tompkins contended that one of Air Duct's suppliers, D.F. Brandt Inc., had a claim against Air Duct for materials furnished on the project, and Tompkins could not safely pay U.S. Air any

amounts claimed by Brandt without first obtaining a release of Brandt's lien.

### Discussion

Although it is perhaps understandable that the bankruptcy judge was disturbed at the parties' failure to produce a copy of the relevant contract, that alone would not furnish a basis for dismissing the claim, particularly where the parties do not dispute the terms of the contract but merely dispute whether the terms were performed.

■ To recover the entire contract price, the plaintiff must demonstrate full performance on its part. *NY Jur.2d* Contracts § 308. The record indicates, however, that certain items within the scope of Air Duct's contract appeared on the "punch-list" prepared by architects Robson & Woese; and that Tompkins itself ultimately performed that punch-list work. In rebuttal, Air Duct merely elicited testimony that the punch-list work performed by Tompkins employees also included work outside the scope of Air Duct's contract.

■ It is evident, however, that Air Duct substantially performed its contractual obligations, and was therefore entitled to the contract price, less the cost to complete or correct the defective work. *City School Dist. of the City of Elmira v. McLane Constr. Co., Inc.*, 85 A.D.2d 749, 445 N.Y. S.2d 258 (3d Dept.1981); *13 NY Jur. Damages* § 42. Nevertheless, as in the case of the Woods County Hospital Project, the Trustee has failed to prove that the balance due to it exceeded the cost to complete the incomplete or defective work within the scope of its contract. Indeed, the only evidence proffered by the Trustee related to Tompkins' nonpayment; he proffered nothing on the issue of cost to complete. Accordingly, this court, like the bankruptcy court, is unable to award any recovery to the Trustee on this contract.

The Order of the bankruptcy court, dismissing the complaint and counterclaims is hereby adopted. Each party is to bear its own costs of this proceeding and the bankruptcy court proceeding.

IT IS SO ORDERED.